# Supreme Court of Texas

No. 22-1100

In re Lakeside Resort JV, LLC d/b/a
Margaritaville Resort Lake Conroe,

*Relator*

On Petition for Writ of Mandamus

**PER CURIAM**

Important consequences flow from the distinction between final and nonfinal judgments, so distinguishing between them should be simple. Our seminal decision in *Lehmann v. Har-Con Corp.*, 39 S.W.3d 191 (Tex. 2001), has eliminated the bulk of any previous ambiguity. The volume of our post-*Lehmann* finality decisions, however, reflects that new scenarios continue to emerge. Since *Lehmann*, for example, we have not addressed the situation presented by this case: whether a purportedly "Final Default Judgment" is final for purposes of appeal despite expressly describing itself as "not appealable."

We hold that the judgment is not final. Its assertion of non-appealability does not just prevent it from unequivocally expressing an intent to finally dispose of the case—it expressly and affirmatively undermines or contradicts any such intent. Under *Lehmann* and its

progeny, an order or judgment that does not follow a conventional trial on the merits is not final on its face unless it is clear and unequivocal about its own finality. Without facial finality, appellate courts typically turn to the underlying record to determine whether the trial court's order or judgment resolved all claims by all parties. For default judgments alone, however, we conclude this second step—consulting the record—is unnecessary when the judgment contains language that affirmatively undermines or contradicts finality. We therefore conditionally grant mandamus relief and direct the trial court to vacate the challenged orders that are predicated on that court's conclusion that its prior judgment is final.

**I**

The material facts of the dispute can be stated briefly. Real party in interest Mendez was a guest at Margaritaville Resort Lake Conroe, which relator Lakeside Resort JV, LLC owns but does not manage. Mendez alleges that she stepped into a deep hole on the property at nighttime, which caused "severe bodily injuries." She sued Lakeside for premises liability and negligence. Her original petition states that she "seeks only monetary relief over $200,000.00 but not more than $1,000,000.00," as well as "pre-judgment and post-judgment interest," "costs of Court," and "expenses."

Lakeside failed to timely answer. According to Lakeside, its registered agent for service of process failed to send Lakeside a physical copy of the service and misdirected an electronic copy.[1] Mendez then

---

[1] Nothing in our opinion turns on the accuracy of Lakeside's explanation, so in that sense Mendez correctly describes it as "irrelevant."

2

moved for a default judgment, which Mendez's counsel drafted and which was labeled a "Final Default Judgment." Mendez's draft judgment proposed awarding herself damages far more generous than the $1 million upper limit stated in her original petition.[2] The district court signed the proposed judgment without modification. Central to the question before us, the judgment concluded with the following language:

> This Judgment finally disposes of all claims and all parties, and *is not appealable*. The Court orders execution to issue for this Judgment.

(Emphasis added.) Lakeside, still unaware of the suit, did not respond before or after the judgment was signed.

Mendez delayed requesting an abstract of judgment until six months after the judgment had been entered, when (assuming that the judgment was final) the district court's plenary jurisdiction had expired and the time for a restricted appeal had run. *See* TEX. R. CIV. P. 329b; TEX. R. APP. P. 26.1. The very day the abstract issued, Mendez sent Lakeside a letter announcing the default judgment and demanding payment.

Mendez sent this letter *not* to the address that she had listed for service of process or for service of the default judgment, but to Lakeside's readily available addresses at its business locations in Georgia. Mendez had also included those addresses in her request for an abstract of judgment. Lakeside contends that Mendez's refusal to use Lakeside's

---

[2] In her proposed default judgment, which the court adopted, Mendez awarded herself about $1.5 million: $342,534.57 for past damages; $1,125,000 for future damages; and $23,977.42 in pre-judgment interest. That amount is growing because of post-judgment interest at 5%. The damages were for medical bills, pain and suffering, mental anguish, disfigurement, impairment, and lost wages. All categories were for both the past and the future, except that lost wages were only for the past.

known address for providing notice of the default judgment violated Texas Rule of Civil Procedure 239a and contributed to Lakeside's lack of knowledge of the default judgment.[3]

Lakeside alleges that it only learned of the suit and resulting judgment at around this time.[4] Lakeside quickly filed an answer containing a general denial, a motion to rescind abstract of judgment,[5] and a combined motion to set aside the default judgment and for a new trial in which Lakeside argued that the "Final Default Judgment" was not truly final. The district court disagreed and denied Lakeside's motions, concluding that the judgment was final and that its plenary power had therefore expired.

Lakeside sought mandamus relief from the court of appeals. Because Mendez refused to delay executing on the judgment, the court of appeals stayed execution pending its consideration of the mandamus petition. The court ultimately denied relief and lifted the stay. It described the trial court's judgment as "erroneously" stating that it was "not appealable," yet it held that the judgment was clearly and unequivocally

---

[3] Whether that is so and, if it is, what the consequences of that violation would be, are immaterial to our decision because we resolve the case on finality grounds.

[4] Specifically, the affidavit of Don Bryant, Chief Operating Officer of Songy Highroads, LLC (the company that handles Lakeside's business and legal affairs) states that neither Lakeside nor Songy Highroads was aware that the lawsuit had been filed until mid-August 2022 "when an attorney representing the company on another matter happened to perform a docket search for Lakeside and brought it to our attention." This time happens to coincide with when Lakeside received Mendez's demand letter of August 18, 2022.

[5] Mendez later requested and received a writ of execution. Lakeside then filed a supplement to its Motion to Rescind Abstract of Judgment to also encompass the writ of execution.

4

final on its face.  ___ S.W.3d ___, 2022 WL 17350945, at *2 (Tex. App.—Beaumont 2022).  Lakeside then sought mandamus relief in this Court. We granted a stay of the order authorizing execution on the judgment and directed the parties to brief the merits of the mandamus petition.

The parties' dispute implicates important questions of appellate jurisdiction, which always requires either a final judgment or an authorized interlocutory appeal.  Mendez contends that the default judgment was final and appealable, so appellate jurisdiction would have existed earlier but now has expired.  Lakeside responds that the absence of a final judgment means that no basis for appellate jurisdiction ever existed in the first place.  Lakeside therefore reasons that it could not have *lost* its right to appeal and that the trial court lacked authority to permit Mendez to execute on what was necessarily an interlocutory judgment.

Given the important jurisdictional consequences of the finality of facially deficient default judgments, we conditionally grant the petition for writ of mandamus without hearing oral argument.

## II

### A

"[N]o-answer default judgments are disfavored" under Texas law. *Spanton v. Bellah*, 612 S.W.3d 314, 316 (Tex. 2020).  Default judgments differ from every other kind in a fundamental way: the losing party is wholly absent.  Other types of orders and judgments result from litigation in which both sides are present, contribute to the creation of a record, and engage in the adversarial clash that refines their arguments and identifies their opponent's errors and weaknesses.  This clash likewise allows both sides to alert the court to perceived judicial errors.  In theory, this collision

5

of evidence and ideas increases the likelihood that accurate and truthful results will emerge from the judicial process. Correspondingly, courts have multiple causes for concern when only one side is present. Courts should worry about the inherent unfairness to the missing party, of course, but also about the threat to judicial integrity and independence that comes from the heightened risk of pronouncing and then enforcing erroneous judgments, backed by the coercive power of the State.

Courts are therefore rightly wary of proceeding in non-adversarial settings, of which default-judgment litigation is a prominent example.[6] We reflect this discomfort with a lack of adversity at all stages of litigation. At the outset, our jurisprudence jealously guards parties' rights to proper service of process, which protects both the parties and the judicial system itself. Throughout litigation, the court must hear both sides together, after proper notice, with each side receiving the same filings and hearing the same evidence and arguments that the court does. Indeed, the very phrase "ex parte"—even in the rare and exigent circumstances in which it is permissible for the court to hear one side to the exclusion of the other—carries a troubling and negative connotation. And at the end of

---

[6] Having both parties before the court is necessary but not sufficient for a fully adversary proceeding. If two parties are present but do not have a genuine dispute, the fundamental principle of adversary presentation is absent. Courts reject the exercise of jurisdiction in such cases because they cannot entertain collusive suits. "A suit is said to be collusive when brought by seemingly adverse parties under secret agreement and co-operation, with a view to have some legal question decided which is not involved in a real controversy between them . . . ." *Tex. & Pac. Ry. Co. v. Gay*, 26 S.W. 599, 612 (Tex. 1894); *accord United States v. Johnson*, 319 U.S. 302, 305 (1943) ("[A] suit is collusive [when] it is not in any real sense adversary. It does not assume the 'honest and actual antagonistic assertion of rights' to be adjudicated—a safeguard essential to the integrity of the judicial process . . . ." (quoting *Chi. & Grand Trunk Ry. Co. v. Wellman*, 143 U.S. 339, 345 (1892))).

litigation, the losing side has a panoply of rights—to seek reconsideration, to demand findings, and ultimately to appeal.

Our law thus greatly disfavors but cannot wholly disavow default judgments. They are tolerable only because the absent party could have appeared but chose not to do so. In other words, while the adversarial clash lends essential legitimacy to the legal process, a party that chooses to disregard the legal process altogether cannot benefit from that choice. Defendants cannot defeat the authority of the courts simply by refusing to appear.

The problem, of course, is that an absent defendant often has not actually chosen to abandon its right to defend itself. For one reason or another, sometimes justifiable and other times negligent or worse, a defendant may be unaware of pending litigation even when a plaintiff's efforts to provide notice technically comply with (or even exceed) what the law requires. Plaintiffs, meanwhile, may be fully aware that a defendant is unaware. The record here provides an example. After Lakeside failed to appear, Mendez secured the default judgment and then waited just long enough (at least if the judgment were in fact final) to obtain the abstract of judgment and begin execution so that the trial court's plenary power had run *and* the time to file even a restricted appeal had passed. Mendez then instantly provided clear notice to Lakeside, using an address at which Mendez knew Lakeside would receive correspondence yet one she had never used when notice would have allowed Lakeside to participate in the case.

Circumstances like these illustrate why default judgments are disfavored. The orderliness of the legal process requires accepting them

7

in at least some situations. But the law's limited tolerance of default judgments should never be mistaken for indulgence or solicitude.

Instead, any doubts about a default judgment must be resolved against the party who secured the default. This principle is prominently and frequently displayed in our cases involving service—the beginning of litigation, as noted above. "We have long held that a no-answer default judgment cannot stand when the defendant 'was not served in *strict compliance* with applicable requirements.'" *Spanton*, 612 S.W.3d at 316 (emphasis added) (quoting *Wilson v. Dunn*, 800 S.W.2d 833, 836 (Tex. 1990)).

Resolving doubts against default judgments extends more broadly than doubts about service, of course. Manifesting this point is the existence of restricted appeals and other procedural mechanisms that specifically aim to give default-judgment defendants additional chances to challenge the judgment. Doubts about a default judgment's finality are also subject to this overriding jurisprudential principle. Indeed, the principle arguably should apply *more* in that context than elsewhere because a final judgment permanently and enforceably adjusts the rights of an absent citizen in favor of one who was present.

**B**

All judgments or orders that do not follow a conventional trial on the merits—including default judgments, summary judgments, and the like—lack the presumption of finality. *See Lehmann*, 39 S.W.3d at 199. But default judgments alone bear the disfavor described above because of the utter absence of the losing party. The intersection of our default-judgment jurisprudence and our finality jurisprudence, therefore,

8

unsurprisingly makes it more likely that a lack of finality would be found for default judgments.

This principle provides essential context for our repeated and accurate statement that there are two ways to establish finality for orders and judgments that do not follow a conventional trial: (1) by showing that the order "actually disposes of every remaining issue in a case" that is reflected in the record; or (2) identifying "language expressly dispos[ing] of all claims and all parties" that is "unequivocally expressed in the words of the order itself," even if the order does not actually do what it claims to do on its face. *Id.* at 200.

We reaffirm that principle yet again. But because any doubt about the finality of a default judgment must be resolved against finality, this principle—in the default-judgment context alone—provides a basis to defeat finality, not just to establish it.

Thus, for default judgments, finality is lacking without regard to other considerations if the judgment contains language that affirmatively undermines or contradicts finality. As we stated in *In re Lynd Co.*, "[a] default judgment is deemed final if it expresses an unequivocal intent to finally dispose of the case." 195 S.W.3d 682, 685 (Tex. 2006). But when a court finds an affirmative indication of nonfinality on the face of a default judgment, that judgment cannot be final; it affirmatively undermines or contradicts any intent to constitute a final judgment. It is not wrong or mistaken, of course, to hold that a default judgment that does not unequivocally express on its face an intent to enter a final judgment is nonfinal for the further reason that the underlying record reflects that additional claims remain pending. *See, e.g., In re Burlington*

9

*Coat Factory Warehouse of McAllen, Inc.*, 167 S.W.3d 827, 830 (Tex. 2005). In *Lynd* and *Burlington*, we looked to the record to determine finality even though we concluded those default judgments did not unequivocally express on their face an intent to enter a final judgment, but nothing in those judgments affirmatively undermined or contradicted that intent. Here, by contrast, the face of the judgment includes language that affirmatively undermines or contradicts finality. We hold that such a default judgment is not final even if a review of the record would reveal that it actually disposed of all parties and all claims.

Drawing on our longstanding jurisprudence about facial finality is therefore essential in this context. We emphasize that, in assessing facial finality, there is no difference between default judgments and any other order or judgment that does not follow a conventional trial on the merits. Our existing jurisprudence applies equally to all such orders, and as to any of them, we have always held that courts cannot find facial finality with "anything less than an unequivocal expression." *Id.*; *see also In re R.R.K.*, 590 S.W.3d 535, 543 (Tex. 2019) (the finality language must be "clear, unequivocal, and unmistakable[,] . . . removing any doubt about its effect" (quotation marks and citations omitted)).

We hold today that further inquiry into the record is extraneous when a court concludes that a default judgment contains language that affirmatively undermines or contradicts finality. In such cases, recognizing that a default judgment is also nonfinal when the underlying record reflects that additional claims remain pending is, of course, accurate and consistent with our precedent because the record often reveals ambiguity or doubt that the judgment is final. *See, e.g., In re*

10

*Burlington Coat Factory*, 167 S.W.3d at 830. Whatever the record reveals, the outcome will be the same—that the default judgment is not final—if the face of such a judgment includes language that negates or undermines finality.[7]

*Lehmann* explained why record analysis helps determine finality: because it can reveal "that an order that *all parties* appear to have treated as final may be final despite some vagueness in the order itself, while an order that some party should not reasonably have regarded as final may not be final despite language that might indicate otherwise." 39 S.W.3d at 206 (emphasis added). Courts examine a record in large part because the record manifests the behavior of "all parties" and it is reasonable for "all parties" to be on notice of what the record contains when they decide whether a judgment or order is final and thus appealable. After all, in non-default cases, both parties have access to the record and have contributed to its formation. But a default-judgment defendant who has played no role in creating the record and typically will not even have access to it cannot be expected to consult it when deciding whether to appeal a judgment that it does not know exists. These features, combined with the law's disfavor of default judgments, confirm that record-based considerations cannot make a default judgment final if it includes language that affirmatively undermines or contradicts finality.[8]

---

[7] To be clear, our holding today is limited to the context of this case, in which a judgment or order expressly includes language that undermines or contradicts finality. We need not now consider, much less adopt, a broader rule applicable to all default judgments in which a judgment is not final at all—regardless of what the record shows—unless it is unequivocally final on its face under the standards articulated in *Lehmann* and our many other cases.

[8] True, a default-judgment defendant may (as here) lack timely access

11

Applying these principles here, we first ask whether the default judgment expresses an unequivocal intent on its face to finally dispose of the case. "This Court's jurisprudence contains many examples of statements that, standing alone, cannot satisfy the clear-and-unequivocal standard." *Patel v. Nations Renovations, LLC*, 661 S.W.3d 151, 154-55 (Tex. 2023). But "no magic language is required." *Id.* at 155. And we have "provide[d] an outline of several statements that, while insufficient standing alone, together form a clear indication of finality." *Id.*

The very reason that the statements in the judgment here, taken together, do not provide a clear and unequivocal indication of finality is because the judgment expressly says that it "is *not* appealable." (Emphasis added.) It is not merely a judgment that fails to unequivocally express finality on its face, in other words, but a judgment that affirmatively undermines or contradicts finality. The court of appeals did not regard this as a barrier, describing the "not appealable" statement as simply "an incorrect statement of law, but that does not mean the judgment lacked unequivocal language of finality." 2022 WL 17350945, at *2 (applying *In re Elizondo*, 544 S.W.3d 824, 828 (Tex. 2018)). We detect at least two flaws in this analysis.

---

not just to the record but to the *judgment*. Compared to a record that is especially unlikely to be available, however, it is far more probable that the defendant will obtain access to the judgment—the public pronouncement of the judicial department of our government—before any opportunity for a challenge is lost. Indeed, in this case, outside counsel for relator nearly discovered the judgment in time to at least perfect a restricted appeal. Regardless, as we have noted, our system cannot entirely dispense with default judgments. When a default judgment affirmatively undermines or contradicts finality, determining the judgment's finality without consulting the record accommodates the requirements of both our default-judgment and our finality jurisprudence.

12

First, the reasoning assumed its own conclusion.  True, it would be an error of law for a judgment to say that it was "not appealable"—if the judgment were truly final.[9]  But *whether* the order was a final judgment is the very question at issue.  Without assuming the premise of finality, it is implausible to treat an order openly proclaiming its own non-appealability as one that is clearly and unequivocally final on its face.[10]

Second, the decision below—like Mendez—misunderstood the effect that contradictory language has on assessing facial finality.  To be unequivocal, there must be *no* language pointing against finality.  The problem here was not the absence of clear indicia of finality—to the contrary, it had plenty.  The judgment is titled a "Final Default Judgment," it states that it "finally disposes of all claims and all parties," and it "orders execution to issue."  If the judgment had included many such statements but omitted one customary indicium of finality, it would be like our recent decision in *Patel*, where we held that finality is not in doubt when a host of indicia are present (even if some common ones are not) and there is no contradiction or equivocation.  661 S.W.3d at 155; *see also, e.g.*, *In re Daredia*, 317 S.W.3d 247, 249 (Tex. 2010).

---

[9] To this extent, the court of appeals correctly recognized that a final judgment can be erroneous yet unequivocal regarding its finality.  *See In re Elizondo*, 544 S.W.3d at 828 ("Error is not the same as ambiguity.").  But the declaration that the judgment "is not appealable" necessarily precludes finality because it negates any clear and unequivocal expression of finality, not because it may be an incorrect statement of the law.

[10] Had the "not appealable" language appeared not in a default judgment but in a judgment following a conventional trial on the merits, the presumption of finality might well justify the court of appeals' approach.  We need not resolve that question because this judgment bore no such presumption, making it circular at best to treat the "not appealable" statement as simply an error of law with no possible effect on the facial clarity of the statement of finality.

But there *was* a contradiction in the judgment here. In addition to the features that imply finality, it also says that it is "not appealable," which implies the opposite.[11] A default judgment containing such contradictory statements cannot satisfy the "unmistakable clarity" standard in *Lehmann*. 39 S.W.3d at 192. More than that, however, it expressly communicates a lack of finality on which parties should be able to rely in light of the unique nature of default judgments we have described. To permit and protect such reliance, we hold that such a judgment is not final even if a review of the record would reveal that it actually disposes of all parties and claims. Our holding that default judgments in particular must turn sharp corners makes it impossible to find this judgment final on its face. All of this is to say that the absence of one familiar indicium of finality is far less significant than the presence of something that affirmatively undermines or contradicts finality.

## C

We conclude by observing how modest our holding is. As is typical of default judgments, Mendez drafted it and would benefit substantially by it. It is not too much to ask that default judgments that are intended to finally dispose of a case not include language that affirmatively undermines or contradicts that very intent. Here, taking two minutes to proofread the two-page order would presumably have eliminated the improper language if the goal was to generate a genuinely final judgment.

---

[11] We emphasize that an order does not have to state that it *is* appealable for it to be final. *See, e.g.*, *In re Daredia*, 317 S.W.3d at 249. If the trial court's intent to dispose of the entire case is otherwise unmistakably clear and without contradiction, the judgment will meet our standard of finality. The judgment in this case, however, is not simply silent on its appealability; it affirmatively injects the opposite of finality by stating that it is *not* appealable.

14

Nor does our holding impose any true burden on a party who fails the simple exercise of preparing an unambiguously final judgment. When a court deems such an order to be nonfinal and thus interlocutory, all the plaintiff must do is ask the court to render a final judgment, which will then allow for eventual execution if the defendant remains absent. Of course, if the discovery that an order is interlocutory happens after the defendant has managed to learn of the lawsuit, the plaintiff may be disappointed because she may need to prove her case on the merits and not just by default. But our system of justice will not regard the loss of a default as cognizable. After all, one of the reasons default judgments are disfavored, and why we require precision in their finality language, is the longstanding public policy that "an adjudication on the merits is preferred in Texas." *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 86 (Tex. 1992).

### III

A default judgment claiming to be "not appealable" cannot be final. The district court clearly abused its discretion by concluding that its plenary jurisdiction had expired and by ordering execution on the judgment. Without hearing oral argument, TEX. R. APP. P. 52.8(c), we conditionally grant the petition for writ of mandamus and direct the district court to vacate its orders denying Lakeside's motions and allowing execution. The writ will issue only if the district court does not comply.

**OPINION DELIVERED:** May 10, 2024